IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    06-CR-392-BR

               Plaintiff,           OPINION AND ORDER

v.

KYLLO PENN,

              Defendant.


**KARIN J. IMMERGUT**
United States Attorney
**PAMALA R. HOLSINGER**
**SCOTT M. KERIN**
Assistant United States Attorney
1000 S.W. Third, Suite 600
Portland, OR 97204
(503) 727-1000

         Attorneys for Plaintiff

**THOMAS K. COAN**
1001 SW Fifth Ave., Suite 1400
Portland, OR 97204
(503) 221-8736

         Attorney for Defendant


1- OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Kyllo Penn's Motion to Suppress Evidence Derived From Wiretaps (Failure to Minimize)(#31) on two of his cellular telephones. For the following reasons, the Court **DENIES** Defendant's Motion.

## PROCEDURAL BACKGROUND

On July 31, 2007, Defendant was charged in a seven-count Second Superseding Indictment with Count 1, Conspiracy to Distribute and Possession with Intent to Distribute 50 Grams or More of a Mixture Containing Cocaine Base (Crack Cocaine) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii) and 846; Count 2, Distribution of 5 Grams or More of a Mixture Containing Cocaine Base (Crack Cocaine) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); Count 3, Distribution of 5 Grams or More of a Mixture Containing Cocaine Base (Crack Cocaine) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); Count 4, Distribution of a Mixture Containing Cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); Count 5, Distribution of 50 Grams or More of a Mixture Containing Cocaine Base (Crack Cocaine) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii); Count 6, Distribution of 5 Grams or More of a Mixture Containing Cocaine Base (Crack Cocaine) in violation of 21 U.S.C. § 841(a)(1) and

(b)(1)(B)(iii); and Count 7, Wire Fraud in violation of 18 U.S.C.
§ 1343.

On August 30, August 31, and September 6, 2007, the Court
conducted an evidentiary hearing on six defense motions,
including Defendant's Motion to Suppress Evidence Derived from
Wiretaps now before the Court.  In the course of this three-day
hearing, the Court heard testimony from Huong Thi Dinh, an
inactive member of the State Bar of California who is employed by
defense counsel and from Portland Police Bureau (PPB) Officer
Christopher Kenagy.  The Court also listened to numerous audio
recordings of communications occurring to and from cellular
telephones subscribed to and carried by Defendant.  The
recordings were obtained pursuant to the Orders Authorizing
Interception of Wire Communications (Wiretap Orders) at issue in
Defendant's Motion to Suppress.

During the proceedings on August 30, 2007, the Court denied
Defendant's Motion to Suppress Evidence Derived from a Wiretap
(Order Insufficient on its Face)(#22) and Defendant's Motion to
Suppress Evidence Derived from a Wiretap (Lack of Probable Cause
and Marital Privilege)(#24).  The Court, however, granted
Defendant leave to renew at a later time.  The Court also granted
Defendant's Motion to Sever Count Seven of the Indictment (#26).
During the proceedings on August 31, 2007, the Court denied

Defendant's Motion to Suppress Evidence Derived from a Wiretap
and for a *Franks* Hearing (#28) and Defendant's Motion to Suppress
Evidence Derived from Wiretaps (Necessity)(#33).

At the conclusion of the proceedings on September 6, 2007,
the Court requested the parties to submit supplemental memoranda
regarding Defendant's Motion to Suppress.

## FACTUAL BACKGROUND

In July 2004, PPB's Drugs and Vice Division began
investigating Defendant Kyllo Penn. Working in conjunction with
the Drug Enforcement Administration (DEA), PPB investigators
identified Defendant as a large-scale distributor of crack
cocaine in the Portland metropolitan area. Although the joint
investigation also identified many of Defendant's associates and
customers, investigators were unable to identify Defendant's
source of supply by using traditional investigative techniques.

On July 25, 2005, this Court granted the government's
Application For Order Authorizing Interception of Wire
Communications occurring to and from a cellular telephone
subscribed to and carried by Defendant, which had the assigned
telephone number (503)209-8288 and was referred to in the Order
as "Target Telephone A." On August 26, 2005, the Court
authorized the continued interception of communications occurring
to and from Target Telephone A. The Court also granted the

4- OPINION AND ORDER

government's Application For Order Authorizing Interception of
Wire Communications occurring to and from a second cellular
telephone subscribed to and carried by Defendant, which had the
assigned telephone number (503)412-8837 and was referred to in
the Order as "Target Telephone B."  On September 23, 2005, the
Court authorized the continued interception of communications
occurring to and from both Target Telephones A and B.

Interception of Target Telephone A began on July 28, 2005,
and ended on or about October 25, 2005.  Interception of Target
Telephone B began on August 26, 2005, and ended on or about
October 25, 2005.

Each Wiretap Order contained a provision requiring law
enforcement to intercept communications "in such a way as to
minimize . . . the communications intercepted to those
communications relevant to the pending investigation."  This
provision specified monitoring

> must terminate immediately when it is determined that
> the conversation [is unrelated to the violations listed
> in the wiretap order, and] . . . must be suspended
> immediately when it is determined through voice
> identification, physical surveillance or otherwise,
> that none of the named Subjects or any of their
> confederates, when identified, are participants in the
> conversation, unless it is determined during the
> portion of the conversation already overheard that the
> conversation is criminal in nature.

Gov. Ex. A at 94-95; Gov. Ex. B at 91; Gov. Ex. C at 77.  In that
case, the Wiretap Orders direct the monitoring agent to "spot-
check to ensure that the conversation has not turned to criminal

matters."

In addition to these provisions in the Wiretap Orders, the Assistant United States Attorneys involved in and overseeing this investigation prepared "Minimization Instructions" for the monitoring agents and reviewed them with all of the law-enforcement agents involved in executing the Wiretap Orders before those agents initiated the interception of wire communications from the target telephones. Each monitoring agent acknowledged reading the written Minimization Instructions as well as the Applications for the wiretaps, supporting Affidavits, and the Court's Wiretap Orders. The Assistant United States Attorneys also made themselves available for consultation around the clock.

The Minimization Instructions set out general listening procedures and record-keeping requirements and procedures. The Minimization Instructions contain a list of the named subjects in the Wiretap Orders, the purpose of the wiretaps,[1] and the requirement that monitoring agents "spot monitor" or stop listening for 30-second intervals to any conversation in which the subjects cannot be identified within two minutes.

---

[1] The Minimization Instructions indicate the purpose of the wiretap was "to intercept conversations about the purchase and distribution of [cocaine], financial transactions related to drug-trafficking, and conspiracy to commit those crimes, as well as conversations about the money used in or derived from these offenses."

The Minimization Instructions provide even if the subject cannot be identified within two minutes or through spot monitoring thereafter and even if the subject is clearly not one of the subjects listed in the Wiretap Orders, monitoring agents may continue to listen if the conversation is criminal in nature and to "spot monitor as appropriate." In addition, if a monitoring agent hears a conversation about criminal activities involving crimes other than those specified in the Wiretap Orders, the Minimization Instructions require interception of a communication about another crime "should cease after two minutes unless it can be determined with certainty within that time that the conversation does in fact relate to other criminal activities, in which case interception may continue." The monitoring agent then must notify a supervisor of the "new offense."

The Minimization Instructions anticipate the "number of minutes of interception necessary to determine whether a conversation is pertinent will shorten" as the wiretap progresses. The Minimization Instructions also encourage monitors to label callers "innocent" if "experience shows that conversations between certain people are invariably innocent" and to listen carefully to conversations with callers whom "experience shows . . . always discuss criminal activities" or who are identified as "participants with the subjects in the drug

conspiracy." Monitoring agents are instructed to notify the "case agent" if these kinds of patterns develop.

Finally, the Minimization Instructions direct monitoring agents to record all conversations that involve a language other than English and to "listen longer than usual" if "code [language] is apparently being used."

During the course of the interceptions in this case, the government filed three 15-day progress reports with this Court. The progress reports list "additional subjects" who were not originally identified on the Wiretap Orders, but who investigators deemed to be "possible participants in [Defendant's] narcotics trafficking activities." The progress reports also summarize the intercepted conversations that monitoring agents deemed "pertinent." Although the Minimization Instructions do not define "pertinent," the Court infers from the context in which the words "pertinent" and "nonpertinent" appear in the Minimization Instructions and the progress reports that monitoring agents deemed an intercepted communication to be "pertinent" when they believed the communication involved a subject named in the Wiretap Orders, when the communication pertained to the specific crimes and underlying activity described in the Wiretap Orders and Minimization Instructions, and when the communication pertained to "other crimes."

The progress reports and the "line sheets" or

contemporaneous notes taken by monitoring agents as they intercepted communications summarize the content of conversations deemed "pertinent" in which Defendant talks about meeting people and picking up and delivering money and items referred to by names such as "white bitch," "tires," "pies," or "shoes." Defendant also discusses hiding money and unidentified items in various houses; picking up and delivering shoes, electronics, and cars; and being "retired" due to the recent arrests of some of his associates.

In total, during the 90-day interception period involving Target Telephone A, monitoring agents intercepted 4,621 completed calls. Of these calls, agents deemed 3,617 to be "nonpertinent" and 1004 to be "pertinent." In other words, fewer than 25 percent of the total number of completed calls intercepted over Target Telephone A were deemed "pertinent," 12.75 percent of the nonpertinent calls were minimized, and 11.23 percent of all completed calls were minimized.

During the approximately 60-day interception period involving Target Telephone B, agents intercepted 668 completed calls. Of these calls, agents deemed 551 to be "nonpertinent" and 117 to be "pertinent." Among the "nonpertinent" calls, 26.86 percent were minimized and 25 percent of all calls were minimized.

## STANDARDS

The government must conduct wire intercepts so as to "minimize the interception of communications not otherwise subject to interception." 18. U.S.C. § 2518(5). "The government has the burden to show proper minimization." *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990)(citing *United States v. Rizzo*, 491 F. 2d 215, 217 n.7 (2d Cir.), *cert. denied*, 416 U.S. 990 (1974)). "Minimization requires that the government adopt reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum while permitting the government to pursue legitimate investigation." *Torres*, 908 F.2d at 1423 (citing *United States v. Turner*, 528 F.2d 143, 157 (9th Cir. 1975), *cert. denied*, 423 U.S. 996 (1976)).

Here Defendant does not challenge the introduction of specific conversations into evidence on the ground that monitoring officers should have minimized those conversations. Instead he contends "law enforcement agents failed to properly minimize a substantial number of calls." Thus, this Court only examines "whether the government has shown a *prima facie* case of compliance with the minimization requirement." *Torres*, 908 F.2d at 1423 (citing *United States v. Turner*, 528 F.2d 143, 157 (9th Cir. 1975), *cert. denied*, 423 U.S. 996 (1976)).

Due to the "necessarily *ad hoc* nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Scott v. United States*, 436 U.S. 128, 140-41 (1978). "The mere interception of calls unrelated to the drug conspiracy does not indicate a failure to meet the minimization requirement." *Torres*, 908 F.2d at 1423 (citing *Scott v. United States*, 436 U.S. 128, 140-41 (1978)). "[B]lind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. Such percentages may provide assistance, but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable." *Scott v. United States*, 436 U.S. 128, 140 (1978). Instead a court should examine the monitoring officers' conduct in light of the particular circumstances of each case when deciding whether the government complied with the minimization requirement of § 2518(5). *Scott v. United States*, 436 U.S. 128, 140 (1978). In this context, relevant circumstances include (1) the breadth of the conspiracy, (2) the length and frequency of calls, (3) the use of guarded or coded language, and (4) the point in time that a questioned interception takes place relative to the beginning of the interception period. *Id*. at 140-42. When an investigation is focused on "what is thought to be a widespread conspiracy, more extensive surveillance may be justified in an

attempt to determine the precise scope of the enterprise." *Id.*
at 140.  Agents may be justified in intercepting many more calls
when they are investigating what they believe to be a widespread
conspiracy "in an attempt to determine the precise scope of the
enterprise . . . [and because the calls] will involve one or more
of the co-conspirators." *Id.*

"During the early stages of surveillance, the agents may be
forced to intercept all calls to establish categories of
nonpertinent calls which will not be intercepted thereafter.
Interception of those same types of calls might be unreasonable
later on, however, once the nonpertinent categories have been
established and it is clear that this particular conversation is
of that type.  Other situations may arise where patterns of
nonpertinent calls do not appear.  In these circumstances it may
not be unreasonable to intercept almost every short conversation
because the determination of relevancy cannot be made before the
call is completed." *Id.* at 141.  It may not be possible to tell
whether a particular conversation is innocent until all of it has
been heard, especially with short calls. *United States v.
Chavez,* 533 F.2d 491, 493-94 (9th Cir. 1976).

"[U]nlawful conspiracies do not always lay bare their plans
in explicit words.  Law enforcement is entitled to latitude to
scrutinize messages by conspirators, because such messages may
contain double meanings and implied purposes, or even be conveyed

in secret code." *United States v. McGuire*, 307 F.3d 1192, 1201
(9th Cir. 2002). Moreover, a "conversation between principals
that begins innocuously may become drug-related." *See Chavez*,
533 F.2d at 494.


## DISCUSSION

### I.   The Parties' Arguments

Defendant requests this Court to find the government failed
to minimize properly the interception of innocent calls, and, as
a consequence, Defendant asks the Court to suppress all of the
evidence derived from the wiretaps in this case. Defendant
contends the government used an "overbroad, arbitrary and
chang[ing]" definition of a "pertinent" call and thereby
unreasonably left monitoring agents to their own devices in
determining whether a call was "pertinent"; the government erred
by failing to formulate categories of "innocent" and repeat calls
early on so that these calls could be quickly minimized later in
the interception period; and the government failed to require
monitoring agents to review the line sheets each day to stay
abreast of developing patterns in the calls, which Defendant
contends would have facilitated speedy recognition of repeat
callers and repetitious subject matter and, therefore, quicker
minimization of calls.

With Ms. Dinh's assistance, Defendant has created his own

13- OPINION AND ORDER

categories of calls that he contends were "innocent" based on the nature of the content of the conversation. According to Defendant, monitoring agents would have been able to minimize most of these calls quickly if they had recognized such patterns of "innocent calls" and kept track of these categories.

Defendant categorizes the following as "innocent calls": (1) "personal calls" to friends, to the mothers of his children, and to children; (2) "personal repeat calls" with the same person about the same topic as in a previous intercepted communication; (3) "marital calls" between Defendant and LaToya Carruthers to whom he was married; (4) "house purchase calls" between Defendant and his landlord and between Defendant and a mortgage company regarding Defendant's attempt to purchase the house that he was leasing; (5) "automated voice calls" in which Defendant listened to a computerized voice solicitation or customer-service message; (6) "paint booth calls" relating to Defendant's attempt to finance and to install a paint booth at his auto-body shop; (7) "business suppliers calls" between Defendant and auto-supply companies regarding Defendant's purchase of parts for auto-mobiles; (8) "business repeat calls" in which Defendant talks with a caller about previously discussed business; (9) "other auto business calls" in which Defendant discusses prices for car stereos, parts, repairs, and where to obtain them; (10) "non-pertinent calls intercepted beyond two minutes" or calls that

were intercepted for more than two minutes before "spot checking" occurred; and (11) "calls involving 'non-targets'" (Defendant identifies nine) where neither speaker is identified as a target in the Wiretap Orders (*i.e.*, someone else was using Defendant's telephone).

Even if the Court accepts Defendant's contention that the government did not properly minimize some calls, the government asserts there is not any authority to support Defendant's requested remedy of suppressing evidence derived from all calls. According to the government, the Court should limit any remedy to suppression of specific calls that were not properly minimized and any evidence derived from those calls. The government, however, maintains the Court should not suppress any evidence because Defendant has not rebutted the government's showing that it adopted reasonable measures to ensure compliance with the minimization requirements and Defendant has not shown that a substantial number of innocent calls were intercepted.

In particular, the government contends Defendant's categories of allegedly "innocent calls" do not merit this Court's consideration because Defendant's witness, Ms. Dinh, created these categories after listening and re-listening to all intercepted calls over 30 seconds while consulting the monitoring agents' line sheets and made after-the-fact judgments about when minimization or spot-checking should have begun. The government

points out the monitoring agents did not have the benefit of the same hindsight when they were listening in "real time." The government also notes Ms. Dinh does not have any law-enforcement experience; is unfamiliar with the drug-conspiracy investigation in this case; and, therefore, she is not qualified to determine whether the calls intercepted in this case were criminal in nature. According to the government, Ms. Dinh also erroneously categorized as "innocent" many calls that were criminal in nature or involved subjects named in the Wiretap Orders. Finally, the government asserts the number of Ms. Dinh's inaccuracies persuasively illustrates the difficulties that monitoring agents face in identifying the speakers and the content of their conversations, particularly when they spoke in guarded and coded language.

For these reasons, the government urges the Court to deny Defendant's Motion to Suppress in its entirety.

## II. Analysis

As noted, the government undertook various measures to reduce the interception of conversations unrelated to the criminal activity under investigation in this case, including the reasonably specific Minimization Instructions for monitoring agents to apply with uniformity. Considering all of these circumstances, the Court concludes the government has made a *prima facie* showing that it complied with the minimization

requirements; reasonably applied those measures; and, in fact, adequately minimized the interception of "innocent" conversations.

Here the investigation focused on a widespread conspiracy to distribute crack cocaine that centered around Defendant, a sophisticated felon with a record of countersurveillance activity and a proclivity for using coded and guarded language in copious daily wireless communications. Based on these factors alone, substantial latitude is warranted, particularly in the early stages of interception.

Defendant, however, seeks to hold the government to an impossible standard of minimization by essentially requiring monitoring agents to be familiar with the entire universe of intercepted calls on any given wiretap and to recognize immediately the voices of "repeat callers" even if that particular monitoring agent had never heard the voice before, to remember whether the caller had previously communicated with the target about criminal matters or employed code language, and immediately to categorize a caller as "innocent" or "criminal." Under Defendant's approach, all subsequent calls from a caller who was categorized as "innocent" should have been minimized as soon as that caller was identified, and monitoring agents subsequently should have "spot checked" to determine whether the conversation continued to be innocent.

As noted, Defendant made his own "innocent call" categories based on Ms. Dinh's analysis of the audio recordings of all completed calls over 30 seconds. Although the Court does not adopt the government's suggestion to disregard Ms. Dinh's categories and statistics summarily, the Court concludes some of the government's arguments concerning Ms. Dinh's analysis are well taken. Indeed, the Court has identified calls in each of Ms. Dinh's allegedly "innocent call" categories that cannot reasonably be considered innocent. For example, in "personal calls" to Target Telephone A, Defendant lists calls between Defendant and the mothers of his children, Thoressa Huff and Faith Callahan. The Court, however, finds more than one of these calls likely involved discussions of criminal activity in coded language. In addition, Defendant included calls involving Angela Carr in this category even though she was a named subject in the Wiretap Orders. As noted, the interception of calls with named subjects is automatically allowed, and minimization is required only if the conversation "is unlikely to become pertinent."

Similarly, under "marital calls," Defendant contends conversations with his wife, LaToya Carruthers, should never have been intercepted due to marital privilege. Ms. Carruthers, however, was a named subject in the Wiretap Orders, and many of these calls involved coded and guarded conversation including conversation about hiding things.

Defendant also contends calls that he categorizes under the "house purchase" category were "personal business calls that were not pertinent to the investigation and should have been minimized much sooner . . . " In Count 7 of the Second Superseding Indictment, however, the government alleges Defendant committed wire fraud when he fraudulently attempted to obtain a home mortgage in these conversations. Thus, these calls clearly fall under the "other criminal activity" provisions in the Wiretap Orders and Minimization Instructions.

With respect to calls that Ms. Dinh placed in the "automated" category (*i.e.*, outside of the scope of the Wiretap Orders) because they were solicitation and customer-service related calls, Defendant included as "innocent" those calls in which he used automated bill-pay systems or made inquiries about his wireless service. Although not directly pertinent to criminal activity, these calls were not categorically innocent insofar as they related to the transfer of illegally derived funds. Moreover, in these calls Defendant also may have conveyed important information about changes to his wireless-telephone service through which he was conducting the targeted illegal activity.

With respect to the four "business call" subcategories that Defendant contends relate only to his legitimate auto-body shop business, the Court need not point out examples because all calls

related to Defendant's auto-body shop were suspect.  The
government had reason to believe that Defendant was selling drugs
and stolen merchandise out of his auto-body shop and buying and
selling automobiles at auctions to launder drug money.  Moreover,
Defendant appears to have placed calls in this category when car
parts such as "tires," "shoes," and "sneakers" were referenced,
yet monitoring agents reasonably believed Defendant and his
co-conspirators used these words as code for drugs.  Thus, it was
reasonable for the government to intercept all conversations
referencing car parts on the basis that the conversations were or
might become related to criminal conduct.

For these reasons, the Court rejects Defendant's argument
that the monitoring agents had reason to develop categories of
"innocent calls" similar to the categories created by Defendant.
As the Minimization Instructions anticipate, such labeling is
only possible if "experience shows that conversations between
certain people are invariably innocent."  In this case,
experience indicated almost everyone that Defendant spoke to was
likely to be involved in his criminal activities even if they did
not know it.

Defendant correctly asserts the monitoring agents did not do
a perfect job of minimizing "non-pertinent calls" and classifying
with consistency calls of a repeat nature as "pertinent" and
"nonpertinent."  The Court concludes such errors merely

underscore the reason that the Supreme Court cautions against "blind reliance" on the percentage of nonpertinent calls intercepted to determine whether the government took reasonable measures to minimize such calls. At any given moment during the administration of a wiretap, several monitoring agents are simultaneously intercepting communications. As PPB Officer Kenagy testified, the initials that appear on the line sheet documenting an intercepted call are not necessarily those of the agent who listened to the call because after an agent logs into the computer program used to create the line sheets, other agents may sit down at that computer. In addition, monitoring agents work in shifts, so it is unreasonable to expect any single agent to be aware of all of the information intercepted on a given day of a complex investigation even if it is reasonable to expect supervisors generally to recognize patterns and codes that may present themselves over a period of days.

In any event, reasonable minds may differ in their conclusion about whether a conversation is pertinent. In addition, even if only one monitoring agent had intercepted all of the calls, inconsistencies in his or her determination as to whether a call was pertinent are inevitable. Monitoring agents do not enjoy the luxury of analyzing the recordings with the benefit of hindsight and of re-listening to calls until they are able to identify who they think the caller is and what the

conversation is about.  Instead monitoring agents must make on-the-spot, real-time judgments; enter their notes into a line sheet; and watch the clock to determine whether minimization is appropriate.

In summary, this record does not indicate the government intercepted a "clear pattern of any substantial number of innocent calls."  *See Chavez*, 533 F.2d at 495.  Thus, the Court concludes the government has met its burden of showing it adopted reasonable measures to reduce the interception of conversations unrelated to the criminal activity under investigation to a practical minimum.  Accordingly, the Court denies Defendant's Motion to Suppress Evidence Derived From Wiretaps.

## CONCLUSION

For these reasons, the Court **DENIES** Defendant's Motion to Suppress Evidence Derived From Wiretaps (Failure to Minimize)(#31).

IT IS SO ORDERED.

DATED this 1st day of November, 2007.

ANNA J. BROWN
United States District Judge

22- OPINION AND ORDER